## In re McCLELLAN'S ESTATE.

Where, on appeal to the circuit court in proceedings for the appointment of an administrator, it was agreed that all the petitions for appointment should be heard together, and thereafter the motion of one of the petitioners, who had perfected a separate appeal for a separate trial, was resisted on the ground of the agreement to consolidate, one of the parties so resisting the motion could not thereafter contend that the appeal of the party who moved for a separate trial should have been dismissed.

Rev. Prob. Code 1903, § 88, declares that, when a petition for letters of administration is filed, the judge must give notice, and section 89 provides that any interested person may contest the petition by filing a written opposition, while section 359 declares that, when the appeal to the circuit court is on question of fact, the trial must be de novo, and that the court has power to proceed in the same manner as if the case had originated there, and to try all questions of fact arising upon the issues. Proceedings for the appointment of an administrator were appealed to the circuit court, and thereafter another and separate appeal was taken by persons who were not parties at the time the proceeding was first removed to the circuit court. Held that, irrespective of the question whether the last appeal was properly perfected, it was nevertheless sufficient to constitute a written opposition to the petitions of the parties to the original appeal, and hence to justify the circuit court in considering as one case all the questions raised by both appeals.

Where, on appeal to the circuit court in proceedings for the appointment of an administrator, the only question at issue was whether or not certain of the parties petitioning for appointment were related to the deceased, error, if any, in allowing an administrator already appointed to participate in the trial, was harmless.

Under Const. art. 6, § 6, declaring that the right of trial by jury shall remain inviolate and shall extend to all cases at law, parties who petitioned for letters of administration had no constitutional right to a jury trial.

For the purpose of proving the contents of records of the British army, it was competent to show, by the deposition of an officer having the custody of such records, that they were not allowed to be removed from the country, and after such showing copies of the records sworn by the officer to have been true and correct were admissible in evidence.

Where on an issue as to the time a certain person enlisted in a certain regiment, it was undisputed that only one person of that name enlisted during a certain 4 year period, error, if any, in admitting without proper foundation secondary evidence as to whether the regiment existed during a part of this period, was harmless.

Where documents admissible in evidence were inaccessible, photographic reproductions made by a photographer shown to be capable, and who testified that the photographs were accurate reproductions of the originals, were admissible.

Error, if any, in permitting admittedly genuine signatures to be compared by experts with photographic reproductions of other signatures, was not cause for reversal, where the experts were not exceptionally well qualified, and their evidence was conflicting and unsatisfactory, so as to be of comparatively little force.

In a trial by the court, error in admitting incompetent evidence is not alone sufficient cause for reversal; it being presumed that the court disregarded it.

The findings of a trial court on disputed questions of fact, though under the statute not as controlling upon the appellate court as the verdict of a jury, must stand, unless the evidence clearly preponderates against them.

In a proceeding for the appointment of an administrator, evidence held sufficient to support findings by the trial court that certain petitioners were not brothers and sisters, and others not children and grandchildren, of decedent.

In a proceeding for the appointment of an administrator, in which certain of petitioners claimed to be children and grandchildren of deceased, evidence by one of these petitioners that a maternal uncle had told him that the records of the War Department showed that a person of the same name as deceased was serving in the army in the vicinity in which deceased lived, was admissible, not to prove the contents of the records or that the father was in fact residing at the place named, but that the family had received information as to the father's location.

In a proceeding for the appointment of an administrator in which certain of petitioners claimed to be children and grandchildren of deceased, a letter written by a deceased brother of those petitioners who

claimed to be children of deceased, stating that he had seen and talked with his father at the town where deceased was living at the time of his death, was admissible as a declaration relating to family history.

In a proceeding for the appointment of an administrator in which certain of petitioners claimed to be children and grandchildren of deceased, a letter written by one of the alleged grandchildren who was present at the trial, stating that he had seen and talked with his grandfather at the town in which deceased lived, was objectionable both as hearsay and as a self-serving declaration.

Under Rev. Code Civ. Proc. 1903, § 301, subd. 4, authorizing a new trial for newly discovered evidence which could not with reasonable diligence have been discovered and produced at the trial, alleged newly discovered evidence consisting merely of an additional certified copy of a document, a certified copy of which was introduced at the trial, and photographic reproductions of the original, did not require the granting of a new trial; there being no showing as to why the photographic reproduction was not obtained in time for the trial, and no motion for a continuance having been made to enable the parties to procure such reproduction.

The policy of the law is to require a party to be diligent in securing his evidence when the cause is tried, and, when alleged newly discovered evidence is merely cumulative and unlikely to change the result, a motion for a new trial is properly denied.

(Opinion filed, April 3, 1906.)

Appeal from Circuit Court, Minnehaha County. Hon. A. W. CAMPBELL, Judge.

Judicial settlement of the estate of John McClellan, deceased. From a decree of the circuit court setting aside the appointment of William Van Eps, the administrator, Mary A. Vine and others, as alleged brothers and sisters of the decedent, and John S. McClellan and others, as alleged children and grandchildren of decedent, appeal. Affirmed.

*U. S. G. Cherry,* for Mary A. Vine.

Administration must be granted to the persons entitled to inherit in the order named in the statute. In the event of the failure of heirs or next of kin the right devolves upon creditors. If there be no creditors then the administration may be granted to any person legally competent. But the right to administer is a statutory one and not discretionary with the Court. Prob. C. Sec. 94, R. C. 1903. Upon the filing of either an original or a contesting petition and the giving of the notice provided by law the Court acquires jurisdiction of the estate and the subject-matter of the proceeding.

The publication of the notice has the effect of constructive service upon all persons interested in the estate. Prob. C. Sec. 88, R. C. 1903. On hearing of the original petition and one or more contesting petitions the Court must order the issuing of letters of administration to the party best entitled thereto. Prob. C. Sec. 90, R. C. 1903. And letters of administration must be granted to any applicant, though it appears that there are other persons having better rights to the administration, when such other persons fail to appear and claim the issuing of letters to themselves. Prob. C. Sec. 92, R. C. 1903. Upon compliance with the statutory requirements on the part of the appellant and the grant of appeal by the Probate Court, the matter appealed is removed from such Court, and it has no power, pending that appeal, to take further steps in regard thereto. 2 Woerner on Ad., Sec. 547 (Second Ed.) ; State v. Litchenberg, 4 Wash. 231, 29 Pac. 999; Durham v. Durham, 16 Gray, 577. In probate matters where an appeal has been effected by a party thereto and a supersedeas bond given, the appeal binds all parties interested in the issue, whether they have appeared or not, and if they wish to join in the issue, they must do so in the Court to which the matter has been transferred by the appeal. State v. Guinotte, 156 Mo. 513, 50 L. R. A. 787; Benoist v. Murrin, 48 Mo. 48. The right of the petitioner to a trial by a jury of the issue of fact involved is constitutional. Sec. 6, Art. VI. In matters of handwriting, photographs are inadmissible for use as a basis of comparison. Hynes v. McDermott, 82 N. Y. 42, 49.

　　*Grigsby & Grigsby*, for James S. McClellan.

Where there is no contradiction of the evidence of plaintiff and his witnesses, and said witnesses were not impeached, it was error to deny its conclusiveness. Hull v. Littauer, 162 N. Y. 569; Engmann v. Estate of Immel, 18 N. W. 182; Jones on Evidence, Sec. 904; Schrechter v. Watson, 70 N. Y. Supp. 1. Counter-affidavits are admissible to impeach the new witness, to contradict the showing of diligence, and even to controvert the newly-discovered evidence by showing that it would be insufficient to change the result. But it would seem that if the evidence thus presented is conflicting, the merits of the case and the credibility of the witness as should be determined by a new trial. 14 Enc. Pl. & Prac., 912-13. The

declaration of deceased persons may be received when such declarations refer to the birth, living or survival, marriage, issue or want of issue, death, the times definite or relative of these facts, relative age or seniority, name, relationship generally, and its degree, and the place of residence when proved for the purpose of identification of persons legally related by blood or marriage to the declarant. Jones on Evidence, Vol. 2, Sec. 316-317. Taylor on Evidence, Vol. 1, Sec. 635-648; Jewell v. Jewell. (1 Howard, U. S. 219); Berkeley Peerage Case, E, 54 Geo. 3 to H., 56, Geo: 3, Campbell's Reports. When the declarations come from the proper source, that is, from legal relatives, since deceased, they are admissible, although they consist of hearsay on hearsay. Taylor on Evidence, Vol. 1, Sec. 639; Monkton v. Attorney General, 2 Russ. & Mylne, 155; Byers v. Wallace, 28 Southwestern, 1057; Red River Cattle Co. v. Wallace, 33 Southwestern, 301 Eisenlord v. Clum, 126 N. Y. 552; Chirac et al v. Reinecker (2 Peters, U. S. 613). Even general repute in the family, proved by the testimony of a surviving member of it, has been considered as falling within the rule. Eaton v. Talmadge, 24 Wis. 222; People v. Fulton Ins. Co., 25 Wendell, 205; Jackson v. King, 5 Cowens, 237.

HANEY, J. A resident of Sioux Falls, known as "John McClellan," died intestate in that city August 3, 1899. Directly, numerous petitions for letters of administration were filed in the county court, among which were the following: One by E. J. Taber, as next friend and alleged creditor, praying appointment of himself; one by H. H. Keith, as an alleged creditor, praying appointment of himself; one by the State Banking & Trust Company, as an alleged creditor, praying appointment of E. J. Taber; one by Margaret Hammil and Mary McClelland, as alleged nieces of the decedent, praying appointment of William Van Eps; one by Mary A. Vine, on behalf of herself and others, as alleged brothers and sisters of the decedent, praying appointment of Cyrus Walts. On the hearing of these petitions the county court appointed Van Eps, to whom letters of administration were issued, and who duly qualified and entered upon the discharge of his duties. From the order appointing Van Eps, separate appeals were taken to the circuit court, on questions of both law and fact, by Keith, Vine, and the trust company.

After these appeals had been perfected, James S. McClelland filed in the county court a petition reciting in detail what had previously taken place and alleging that Van Eps was not related to the decedent; that the decedent's sole surviving heirs were certain alleged sons and grandsons; that he "contests and opposes each and every of the petitioners" therein mentioned; and praying that Van Eps letters be revoked. This petition was denied and an appeal taken to the circuit court on questions of both law and fact. For the sake of brevity, these alleged sons and grandsons will be termed the "Arkansas claimants"; the alleged brothers and sisters, represented by Mary A. Vine, the "Canadian claimants"; and the alleged nieces, Mary Hammil and Mary McClelland, the "Ireland claimants." In the circuit court Van Eps, as administrator, the Canadian and the Ireland claimants, moved to dismiss the appeal of the Askansas claimants on the following grounds: (1) That no sufficient appeal bond had been filed; (2) that the order appealed from was not entered before the appeal was taken; and (3) that neither the circuit nor the county court had jurisdiction thereof, for the reason that the Arkansas claimants' petition was filed in the county court after the matter of Van Eps' appointment had been removed by appeal to the circuit court. This motion was denied. At the April, 1900, term of the circuit court the Arkansas claimants "moved the court to submit to the determination of a jury all the issues of fact involved in the several appeals, said motion was granted, and all parties to said appeals consented to the trial of all said appeals together in one trial, and thereupon the court so ordered." The trial resulted in a verdict favorable to the Canadian claimants. Afterwards, on motion of the Ireland and Arkansas claimants, a new trial was granted. On June 11, 1901, the matter again came on for hearing before the circuit court; all previous parties, except the Canadian, Ireland, and Arkansas claimants, and the administrator being in default. Thereupon the Canadian claimants moved the court to submit certain proposed issues of fact to a jury. They also moved to have all issues of fact arising upon the trial so submitted. Both motions were denied. So the case entitled "In the Matter of the Estate of John McClellan, Deceased," was called for trial. Whereupon the Arkansas claimants moved that their appeal

be placed on the calendar for trial independently of the case called. To this the Canadian claimants objected on the following grounds: (1) Because the Arkansas claimants had not filed the required appeal bond; (2) because their pretended appeal was not properly upon the calendar of the present or preceding term; (3) because the order appealed from was not entered when the appeal was taken; (4) because the court was without jurisdiction to hear the appeal, the county court having been without jurisdiction to consider the Arkansas claimants' petition, for the reason that it was filed in the latter court after the matter of Van Eps' appointment had been removed by appeal to the circuit court; (5) because no appeal had been perfected; and (6) because, "at the last trial, after the overruling of the objections above stated, the petitioners James S. McClelland and the persons named as relatives in said petition, and claiming to be parties entitled to administer the estate, consented in open court to the trial of this matter as one proceeding, and that the matter was so tried, and that this is merely a retrial of that matter." The abstract states that this motion and these objections were both overruled. The Canadian claimants then objected to the administrator appearing or participating in the proceeding, for the reason that he was not a proper party and should be entirely indifferent in a contest between rival claimants to the estate, which objection was overruled, and tne trial proceeded without a jury. At its conclusion the learned circuit court filed its decision in writing finding specifically that none of the claimants was an heir of the decedent; concluding as a matter of law "that the order of said county court appointing William Van Eps administrator of the estate of John McClellan, deceased, should be reversed, vacated, and set aside, to the end that some person may by said court be appointed administrator of said estate upon the application of some person or persons authorized to petition therefor"; and directing that judgment be entered accordingly. Thereafter the Canadian and Arkansas claimants made separate applications for a new trial, each of which was denied, and from the orders denying such applications appeals were taken to this court.

It will be observed that at the second trial in the circuit court there remained only four parties, namely, the Canadian claimants,

alleged brothers and sisters of the decedent; the Ireland claimants, alleged nieces of the decedent; the Arkansas claimants, alleged sons and grandsons of the decedent; and Van Eps, the administrator— each of whom was defeated by the decision. The Canadian and Arkansas claimants alone appealed, and they alone are in position to challenge the correctness of such decision.

The Canadian claimants contend the court erred in not dismissing the Arkansas claimant's appeal. The contention is untenable. It is not consistent with their conduct in the circuit court. Before the first trial they consented to have all the petitions heard together, and no reason was shown why the consolidation thus effected should have been set aside. When the Arkansas claimants asked for a separate trial they objected on the ground, among others, of the former agreement to consolidate. If they did not desire to have the Arkansas claimants' petition heard in connection with their own, they should not have resisted the motion for a separate hearing. Moreover, the course pursued by the learned circuit court is sanctioned by the statute and did not prejudice any substantial rights. The Revised Probate Code of 1903 provides:

"Sec. 88. When a petition praying for letters of administration is filed, the judge must give notice thereof containing the name of the decedent, the name of the applicant for letters, and the day and term of the court at which the application will be heard, which notice must be published by posting or printing in a newspaper, the same as required for notice of the probate of a will.

"Sec. 89. Any person interested may contest the petition by filing written opposition thereto on the ground of the incompetency of the applicant, or may assert his own rights to the administration and pray that letters be issued to himself. In the latter case the contestant must file a petition and give the notice required for an original petition, and the court must hear the two petitions together."

"Sec. 359. When the appeal is on questions of fact, or on questions of both law and fact, the trial in the circuit court must be de novo, and shall be conducted in the same manner as if the case and proceedings had lawfully originated in that court; and such appellate court has the same power to decide the questions of

fact which the county court or judge had, and it may, in its discretion, as in suits in chancery, and with like effect, make an order for the trial by a jury of any or all the material questions. of fact arising upon the issues between the parties, and such an order must state distinctly and plainly the questions of fact to be tried."

The Canadian and Ireland claimants' petitions were certainly pending in the circuit court by reason of the appeal from the order of the county court appointing Van Eps, "on questions of both law and fact." They were there for trial de novo; the hearing to be conducted in the same manner as if the case and proceedings had originated in the circuit court. Though the Arkansas claimants' appeal may not have been properly perfected or neither court acquired jurisdiction of their petition as such, nevertheless it was in fact filed in the circuit court, and was amply sufficient to constitute the written opposition of interested persons who at least were authorized to contest the other·pending petitions on the ground of the· incompetency of the applicants. The right of the Canadian claimants to question Van Eps' 'appointment rested alone on their alleged relationship to the decedent. Such relationship was the only issue of fact presented by their petition. If successful as to such issue, they would name the administrator; if not successful, it was wholly immaterial to them who was the administrator or what was done with other petitions for letters of administration. The right to contest a petition includes the right to cross-examine witnesses, make objections to testimony, and offer evidence tending to prove the incompetency of the petitioner. If either group of claimants was related to the decedent, neither of the others could be. Hence, evidence in support of one tended to refute the allegations of the· others, and the only sensible method of procedure was to hear all the petitions together, the course required by the statute and pursued by the learned circuit court.

For the same reasons, the contention of the Arkansas claimants that they should have been given a separate trial cannot be sustained. They had consented to the consolidation of the several cases, the other petitioners were entitled to contest their claim of' relationship to the decedent, and the statute required the court to· hear all the petitions together.

It is contended that the court erred in overruling the objection interposed at the beginning of the hearing, to the participation of Van Eps therein. We are inclined to think he was not, as administrator, interested in the only issue involved, namely, whether any of the several claimants were related to the decedent. But, assuming this to be so, his activity could not have prejudiced any one's substantial rights. The inquiry demanded a thorough investigation. The trial was by the court without a jury. Its rulings on the introduction and rejection of evidence were subject to review. Unless the Canadian claimants can show that proper evidence was excluded or improper evidence admitted they have no cause to complain, and no other parties are complaining.

It is urged that the court erred in refusing the damand of the Canadian claimants for a trial by jury. Section 6, art. 6, of the state Constitution ordains that "the right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy." The effect of this provision was merely to continue unimpaired and inviolate the right as it existed in the territory when the Constitution was adopted. It neither added to nor took from that right, except to extend it to "all cases at law" without regard to the amount in controversy. 6 Am. & Eng. Ency. Law, 974; Belatti v. Pierce, 8 S. D. 456, 66 N. W. 1088. The law in force when the Constitution was adopted was the same as it is now. It expressly authorized the court to decide the questions of fact, or in its discretion, as in suits in chancery, and with like effect, to submit such questions to a jury. Rev. Prob. Code 1903, § 359; Comp. Laws 1887, § 5976; Prob. Code 1877, § 326. So the right did not exist when the Constitution was adopted, a petition for letters of administration is not a "case at law" as that term is understood and construed by the courts, and the court invaded no constitutional right by refusing a jury trial. Schmidt v. Schmidt, 47 Minn. 451, 50 N. W. 598.

The Canadian claimants sought to prove that their brother John McClelland entered and deserted from the British army at Toronto in 1856. To show that this enlistment and desertion occurred in 1859, alleged copies of the original attestation and register sheet of one John McClelland were introduced in evidence, to the intro-

duction of which numerous objections were interposed and over-ruled. T. A. G. Sangster testified by deposition that he was a captain of a certain regiment, the first batallion of which was formerly known as the 100th regiment (Royal Canadians); that the depot of the regiment was then at Birr, Kings county, Ireland; and that he was in charge of the original records of the men of such regiment. He stated the manner in which the attestation and register sheet of each man was prepared and preserved; that they were filled up at the time stated therein by officers whose duty it was to make and keep the records; that they had never been allowed out of the custody of the regiment; that he had made a thorough and complete search through the records of the regiment and had found that the only John McClellan or John McClelland who enlisted for the 100th regiment between the years 1856 and 1860, inclusive, was a certain John McClelland, who enlisted on February 15, 1859, and deserted on April 12, 1859; that the 100th regiment was not in existence in 1856 or 1857; that the 100th regiment disbanded in 1818 and was not raised again until 1858; that he had verified the history of the 100th regiment from the original records kept at the war office in London, which he had personally inspected; that he had in his custody the original attestation and register sheet of the John McClelland mentioned; that the originals could not be sent to America; that Exhibits A and B were true and correct copies of such originals; and that it was not possible that the originals had been altered, as the several dates therein were perfectly clear and distinct, and the originals bore no trace whatever of any alteration or attempt at alteration. The records being in a foreign country made and preserved under the military regulations of that country, it was clearly competent to show by an officer of the British army what such regulations were, that such regulations had been complied with, and what was found by the proper custodian after a thorough search of the regimental archives. The evidence so received was the best which the nature of the case afforded, with the possible exception of the statement regarding the existence of the 100th regiment; and, if that statement was erroneously received, it was error without prejudice, for the reason that the search of the records disclosed the fact that only one person by the name of

John McClelland or John McClellan was enlisted in the regiment from 1856 to 1860, both inclusive; a fact which rendered the statement as to the existence of the regiment in 1856 and 1857 immaterial and harmless, the testimony of the British officer as to the contents of the regimental records being uncontradicted.

It was not error to receive in evidence photographic reproductions of portions of the enlistment papers. The photographer testified that he had been engaged solely in that business for upwards of 10 years; that he was manager of the Armagh branch of the firm of "Allison, Photographers, Belfast"; one of the highest class photographers in Ireland; that he went to the barracks at Birr and took true and correct negatives of certain portions of the original attestation and registration sheet, they being submitted to him for that purpose by the officer in charge of the same; and that the exhibits attached to his deposition were correct and exact photographs in every detail of the portions of the originals which they respectively represent. The originals could not be produced; the witness was not cross-examined; the photographs themselves appeared to be correct reproductions; the foundation for secondary evidence was properly laid; and though testimony subsequently received, touching different photographic processes, may have diminished the evidentiary value of the photographs, it did not render the ruling on their admission erroneous or require their exclusion. And they clearly were admissible for the purpose of showing that the copies furnished by the custodian of the original records were true and correct; especially with respect to the dates of the soldiers' enlistment and desertion, the only really important purpose served by such records.

Experts in handwriting were permitted to compare the signatures in the photographic reproductions of the enlistment papers with proved signatures of the decedent and a proved signature of the Canadian McClelland, for the evident purpose of showing that the signatures on the enlistment papers were written by the latter and not by the former. Regarding the use of photographic reproductions for comparison of handwriting the authorities are conflicting. We apprehend that the constant development of the art has served to weaken, if not remove, many reasons assigned in earlier

cases for not allowing such comparisons, but the question need not now be determined. The several signatures were before the trial judge; none of the so-called experts was exceptionally well qualified; their evidence was conflicting and unsatisfactory; and, in view of the entire record, it would be unreasonable to suppose that a different ruling regarding this testimony would have resulted in a different decision. Moreover, if the evidence was incompetent, the judgment cannot be reversed on that ground alone, for the presumption is that the court disregarded it and based its findings upon the competent evidence in the case. Godfrey v. Faust, 18 S. D. 567, 101 N. W. 718; Id., 20 S. D. — 105 N. W. 460.

The learned circuit court found that the Canadian claimants are not brothers and sisters of the decedent. The findings of a trial court on disputed questions of fact are always presumptively right, and though, under our statute, not as controlling upon this court as the verdict of a jury, must stand, unless the evidence clearly preponderates against them. Feldman v. Trumbower, 7 S. D. 408, 64 N. W. 189; Randall v. Burk Tp., 4 S. D. 337, 57 N. W. 4; Reid v. Kellogg, 8 S. D. 596, 67 N. W. 687; Webster v. White, 8 S. D. 479, 66 N. W. 1145; McKenna v. Whittaker, 9 S. D. 442, 69 N. W. 587; Hulst v. Association, 9 S. D. 144, 68 N. W. 200; Grewing v. Machine Co., 12 S. D. 127, 80 N. W. 176. There was evidence tending to prove that the Canadian claimants were the surviving sons and daughters of Abraham McClelland, a native of Ireland, who was the father of five sons and four daughters, named William, Samuel, John, Abraham, Thomas, Jane, Frances, Margaret, and Mary Ann, and who, after his marriage, resided for a time at Irvenstown, county Fermanagh, later at or near Armagh, county Armagh, whence he emigrated with all his family, except William, in 1850, taking ship at Belfast, landing at Quebec and settling at Niagara on the Lake, Canada, where he was joined by his son William two years later; that Abraham McClelland was a farmer and linen weaver and belonged to the constabulary in Ireland; that his son John, who is claimed to have been the decedent, was born at Irvenstown, September 27, 1831; that John was about 5 feet 7½ inches in height, weighed about 160 pounds, had dark gray or hazel eyes, brown hair, and unusually large thumb joints, a family char-

acteristic; that he killed a neighbor's dog while living in the county
Armagh; that he used his left hand more than his right, though he
wrote with his right, having been required to do so at school; that
he was fond of hunting, always shooting from the left shoulder;
that he had a peculiar disposition, much given to joking and story
telling, frequently referring to stout women as "Mullingar heifer
and beef to the heels"; that he had a peculiar habit of straightening
up and throwing back his shoulders; that the family were all Prot-
estants; that John was fond of reading the Bible, though he be-
longed to no church; that he worked for a time on a farm across
the river in New York state, afterwards on farms in Canada; that
he drove stage between Niagara and St. Catherine's, worked in
the woods timbering where he once was lost, his last occupation in
Canada being that of a butcher; that he brought home a Bible on
the fly leaf of which he wrote his name, the word "Bible," and
"April 5th, 1855"; that he was in the habit of singing or repeating
certain lines about an "Irish girl with red and rosy cheeks"; that
he was addicted to the use of intoxicants; that early in the year 1856
he and one of his brothers had a serious altercation regarding the
butchering of some animal, in which blows were exchanged, and he
left home, declaring his brother should "never see his face again on
earth"; that he went to Toronto, where he enlisted in the 100th
regiment, soon after deserted, met his mother at Youngstown on the
American side, bade her farewell, and started for the west; that
two letters were received from him by his mother, one of which
contained a tintype of himself; that these letters and tintype were
preserved by his mother until her death in 1890, after which they
were not seen and could not be found at the time of the trial; that
aside from these letters he was never again heard from by his
family; and that he had not been married when he left home. No
one remembered the contents of the letters or from what place they
were written, beyond a vague impression that they came from the
west, and in some way referred to Colorado. A photograph of
decedent and certain other persons taken about 14 months before
his death was shown members, relatives, and neighbors of the Can-
adian family, all of whom swore they recognized the picture as that
of the Canadian McClelland. There was also testimony tending to

prove that the name of the Canadian family was properly spelled McClelland, and that in unimportant matters the final "d" was often omitted; that the Thomas of that family belonged to the mounted police during the Reil Rebellion; and that his name was frequently mentioned in the newspapers in connection with that uprising. It was shown and is conceded that the decedent was at Sioux City in June, 1857; that he came from there to Sioux Falls in August of the same year; that he enlisted in the Dakota cavalry late in 1861; serving therein until early in 1865; that from May to November of that year he was employed in locating a military road from Minnesota to Montana, after which he was at Yankton and the Crow Creek Indian Agency until 1870, when he returned to Sioux Falls and there resided until the time of his death; that in an application for membership in the Masonic lodge at Yankton, dated September 8, 1867, his age was given as 35; and that in an application for membership in the lodge at Sioux Falls, dated January 28, 1874, his age was given as 42. There was testimony tending to prove that the decedent was about 5 feet 7½ inches in height, weighed, when he came to Dakota, about 160 pounds, had brown hair before it became gray, dark gray or hazel eyes, large thumb joints, and was fond of hunting; that he shot from the left shoulder, carried his cane in the left hand, but wrote with his right; that he had a peculiar habit of throwing back his shoulders, was an inveterate joker, was familiar with the Bible, belonged to no church, and used intoxicating liquors to excess, especially in the later years of his life; and that prior to 1862 he wrote his name "McClelland," after which time he dropped the final "d." Numerous residents of Sioux Falls who had known him intimately testified that Mrs. Bulkley, one of the Canadian claimants present at the trial, bore a striking resemblance to the decedent, and that there was a less marked resemblance to her brother Thomas, who also was present. Though it is evident that the decedent was extremely reticent regarding his relations and personal history before coming to Dakota, numerous witnesses testified to conversations wherein he had alluded to such matters. Some of the allusions were to the folowing effect: That his father's name was Abraham; that his family left Ireland in 1850, landed at Quebec, and settled in Canada; that he was in the

British army and "left·them" or took "French·leave"; that he was once lost in the big woods of Canada; that he had relations in Canada; that he was never married; that he knew and described people who lived near Niagara on the Lake; that he left Canada in 1856; came to Dakota by way of Sioux City; that he came from a place pretty near between the counties·of·Tyrone and Armagh, Ireland; spoke of Lough Neagh, appearing to be familiar with the locality of Armagh; spoke on hunting trip of having newspaper with article relating to the Reil Rebellion, which referred to Thomas McClelland, and remarked that he had a brother Tom; that he had a sister with two children in Canada; spoke of being at Toronto, Niagara Falls, Sioux Falls, and St. Anthony Falls; said in August, 1897, he was 65 and was born in September; that he had a sister named Jane; that he had 10 years start of one born in 1841; that he was born in Fermanagh, but did not live long in that county; spoke of having had trouble about killing a beef; said he would call the witness "Tom" because he had a brother named Thomas;· said he had been over the road between Niagara and St. Catherine's a number of times; that he was raised on a farm in Ireland; that his father was a linen weaver; that he had trouble in Ireland over the·killing of a neighbor's dog; and that he repeated the lines about ·an·"Irish girl" heretofore mentioned.   The records of Minnehaha county disclose numerous conveyances executed by the decedent from 1864 to shortly before his·death, wherein he was described as "a single man," a "single person," or "unmarried."   And·though there was evidence tending to prove that his height was only 5 feet 6 inches, and that he made statements to the effect that his father was a school teacer named John, that he was born in county Armagh in 1821, that he came from Ireland alone, and that he had no relations in this country, it cannot be denied that there was a large volume of evidence touching conversations and incidents in the decedents life strongly tending to prove that he and the Canadian McClelland were one and the same person.   On the other hand, the records of the 100th regiment, if genuine and correctly reproduced, render such identity highly improbable,·if not practically impossible.   They show the enlistment of only one Mc-

Clellan or McClelland from 1856 to 1860, both inclusive; that his age was given as 25 years and six months, his height 5 feet 7½ inches, color of eyes hazel, hair brown, occupation butcher; and that he enlisted February 15, 1859, and deserted April 12, 1859, the year being in words, not figures, on the oath of allegiance, as shown by the photographic reproduction. If the Canadian McClelland was born September 27, 1831, his age was 24 years, 4 months and 18 days on February 15, 1856; 27 years, 4 months, and 18 days on February 15, 1859. So, if the enlistment papers related to him, there was an error as to his age whether he enlisted in 1856 or 1859. The Canadian McClelland disclosed by the evidence should have known his own age, and there was no apparent reason for misstating it when enlisting under his true name. While this error may not be important, it does not serve to identify him as the person described in the enlistment papers. Still the case of the Canadian claimants rests on the theory that their brother enlisted in 1856 and soon after deserted. His description, except as to age, corresponds identically with that of the recruit who enlisted early in 1859 and soon after deserted. The enlistment and desertion were at Toronto in and from the 100th regiment. It would be strange indeed if two men of the same name, ocupation, height, complexion, and color of hair and eyes, should have thus enlisted and deserted, one in 1856, the other in 1859. The only reasonable inference is that the regimental records referred to the Canadian claimants' brother, and the question arises whether he enlisted and deserted in 1856 or 1859. This is of vital importance, because, if he did not enlist until 1859, he was not the decedent, who is conceded to have been in Dakota from August, 1857. Numerous witnesses swore positively that the Canadian McClelland left home in 1856, giving more or less convincing reasons for the accuracy of their recollections. Nevertheless, it is more probable that they were mistaken than that the records were wrong, provided such records were genuine and correctly reproduced. There is nothing before us upon which to base an assumption that the British officer who had charge of these records, and who had no interest in the litigation, was guilty of fraud, perjury, or want of proper care in giving his deposition. It is true five residents of Toronto testified they were members of the 100th

regiment, one of whom stated that there were several soldiers in it by the name of McClelland or McClellan; another that there was one McClelland and one McClellan, each of whom he described; and still another, that there was no man by any such name during the years material to this controversy. But they were all positive that enlistments did not begin before 1858. And, though their evidence may have served in some slight degree to discredit the records, it certainly cannot be said to have destroyed their probative force. Furthermore, in a letter written by Mrs. Vine to the county judge, dated November 13, 1899, this language occurs: "I forward our family Bible which contains our brother John's signature on the inside of the fly leaf. * * * He bought the bible himself about five years before he left home." The words on the fly leaf are: "John McClellan Bible, April 5th, 1855." In a signed and sworn statement made by William McClelland, November 11, 1899, this language is found: "John McClelland, my brother, left Portadown, Ireland, in 1850, was then 18 or 19 years old. Emigrated to America and settled in Niagara, Ont., left Niagara in 1860 and went to Colorado, was last heard of when crossing the mountains with a mule train 30 years ago." In the original the words "30 years ago" are written in red ink; the balance of the statement being typewritten. It will be observed that these statements, probably made before it was known to the Canadian claimants that the decedent reached Dakota in 1857, corresponded with the dates shown by the enlistment papers, and though it was claimed that William was seriously ill when his statement was verified, and that Mrs. Vine wrote her letter in great haste, the effect of the statement and letter cannot be wholly disregarded, besides the Askansas claimants introduced evidence, hereafter considered, relating to incidents in decedent's life which directly conflicts with what has been reviewed. Nearly all the testimony in the case was oral, relating to long past events involving the unaided recollection of witnesses more or less influenced by their relations to the litigation and litigants. There had been two previous trials. Opportunity and temptation to color particular circumstances were not wanting. Very much depended upon the memory, intelligence, honesty, the credibility of numerous witnesses. No reason is shown why the decedent, if he was the

Canadian McClelland, would not have continued writing to his mother, or have visited her, possessed as he was of ample means and a disposition to travel for years prior to her death. Manifestly there was not such a clear preponderance against the finding of the learned circuit court with respect to the alleged relationship of the Canadian claimants as would justify this court in setting it aside.

The learned circuit court also found that the Arkansas claimants were not sons and grandsons of the decedent. Robert Wilson of Glenwood, Minn., age 69, testified substantially as follows: Witness was born in county Meath, Ireland; his mother's maiden name was Ruth McClelland; her father's name was Samuel McClelland; she had three brothers, Charles, John, and one who died in childhood, and four sisters, Ann, Catherine, Mary Jane, and Elizabeth. Her brother John was born at Skryne county Meath, was nine or ten years older than the witness, was a gamekeeper on the Dillon estate. Game keepers were called "wood-rangers" and accompanied the owners of estates when out hunting. Witness saw his uncle John just before leaving Ireland in 1842, when the witness was 11 years old. Witness' family sailed from Liverpool, landed at New York, were at Rochester, and went to Scugog Island, Canada, in 1847. Witness' Uncle John, wife, and one child, three or four months old, came to Scugog about a year later and lived with witness' family during the first winter. His wife taught school. While there another child was born. After being there over a year John and his family removed to Port Perry; later to St. John, New Brunswick. Letters were received from his uncle while the latter was at St. John, which have been lost, in one of which it was stated that his uncle had separated from his wife on account of a quarrel with her brothers. Mullingar was a place in county Meath noted as a market for fat cattle, whence came the saying common in Ireland and Canada, when one sees a very stout woman: "That she looks like a Mullinger heifer beef to the heels." Witness' uncle was of sandy complexion, had dark hair, dark blue eyes, was square built; a short man, rather light-hearted in general, though quick tempered. Was fond of sport, never liked work, did scarcely anything but hunt and fish, usually shooting from the left shoulder. He had two children when he left Scugog Island, and one afterwards. Witness

recognized Exhibit 45 as the picture of his Aunt Hannah, his Uncle John's wife, and "believed" a picture of decedent was a picture of his uncle.   John McClellan, a resident of Mineola, Tex., age 54, testified substantially as follows: Was born at Skryne county Meath, Ireland.   Father's name John McClellan; mother's maiden name Hannah Cruikshank.   Learned from father and mother, principally from mother, that parents went to Canada when witness was about three months old; that they sailed from Dublin to Liverpool, then to Quebec and Port Hope; that they landed at Port Hope and not at Quebec; and that they lived for a time on Scugog Island.   Witness was four years old when family removed to St. John.   Witness lived there about six years.   Was eight years old when his father left home.   Never saw him afterwards.   Father was engaged with mother's brothers, John and Joseph Cruikshank, as subcontractors constructing Intercolonial Canal Railroad, then being built from St. John inland.   Father went away in 1854.   There were three sons in the family, the witness, the oldest, next William, who is dead, and James S., who was present at the trial and who was born in 1851. Witness remembered there was a quarrel between his father and mother's brothers.   Could not state what was said because he ran from the room when his father was knocked down by Joseph Cruikshank.   Witness shown Exhibit 56, a Bible bearing upon inside of cover the inscription: "A wedding present for John and Hannah McClelland from the Reverend Richard Radcliff, Feb. 1, 1846"— below which is other writing obliterated by erasures.   Witness had seen book many times, first saw it at home in New Brunswick.   It was not then in same condition.   There was in addition to inscription a record of the birth of the children.   Was told by mother that she found father trying to erase entire page; that father intended to abandon and leave his home and claimed he would state he was not married to her, and that the children were illegitimate.   Neither mother nor either of her brothers is now living.   It was reputed in the family father was seen in New York state.   This was learned from Joseph Cruikshank.   Witness remained at St. John until 1862, when he went to Boston.   After several months was followed by his brother William.   Worked at or near Boston until fall of 1864, when both enlisted in Second Massachusetts cavalry, United States

army. Served about five months and were discharged under the minor act. When discharged it was their family history that father was in Dakota. Had a fire in 1871, in which some of mother's and witness' books and papers were destroyed, including mother's original marriage certificate, after which there were no papers or documents belonging to father in the family. Witness has been in Texas about 11 years. William was on the stage. He enlisted in the Seventh United States cavalry. In 1869 or 1870 he told the witness he had deserted the preceding winter, gone into Dakota with some sort of a government surveying party and found his father at Yankton; that he had asked his father about the threat to declare the children illegitimate; and that his father said he would, if they did not let him alone. Witness shown Exhibit 53. It is a letter received from brother, William, before his arrival in winter of 1869 or 1870; received through the mail. It is in William's handwriting. About the time mother received this letter she received a photograph. Exhibit 65 is that photograph, a picture of William and a comrade who served in the army with him. He signed the letter and assumed the name of "Henry Wilber." After this William became an actor and followed that profession until his death. Last saw him at Little Rock in 1880. He told witness he had seen his father while traveling through the country, thought it was at Sioux City. Witness shown Exhibit 66. It is picture of brother, William, whose stage name was "William Standish." Mother died at Little Rock in 1881. The Wilber letter was in witness' possession after her death until it was sent to Grigsby, Wright & Grigsby, at Sioux Falls. Father had two older brothers, William and Charles; William died when a child. Believe he had four sisters, Ann, Elizabeth, Catherine, and Ruth; remember only Aunt Ruth, the mother of Robert Wilson. Brother William left children; one child by first wife being William McClellan, present in court. The testimony of James S. McClellan, another alleged son of the decedent, omitting portions merely corroborative of preceding witness, was substantially as follows: Age 49 years; residence Little Rock, Ark.; foreman of planing mill and lieutenant colonel state militia. Witness' mother told him the Bible, Exhibit 56, was a present from minister by whom she was married, and that inscription was written by such

minister. The Bible was in possession of witness from mother's death until sent to county court. Was told by Uncle Joseph Cruikshank that father went to Duchess county, N. Y., where he visited with a relative of the family. Witness was 13 when he went from St. John to Boston. His mother secured assistance of her brother, Joseph Cruikshank, to ascertain name of regiment in which her two oldest sons had enlisted, who learned from the records at Washington where the boys were, and also that father was or had been in the army in Dakota. After fire witness prepared, under direction of mother, a family tree or record, which was with her until her death, and then with witness until produced in court. Witness was shown Exhibit 50 by mother, in Boston, in 1872, and told that she procured it from Ireland to take place of one destroyed by fire. Exhibit 53 (Henry Wilber's letter mentioned by previous witness) is in handwriting of brother, William, deceased. First saw it in fall of 1869 at Belmont, Mass. It was received by mother through the mail. Witness enlisted in regular army in 1872. During service, while in Dakota, received letter from mother that father was in Dakota, and afterwards mailed a letter addressed John McClellan, Sioux Falls, with a return card, name, company, and regiment on envelope, which was not returned and not answered. Brother William enlisted second time about 1866, in Seventh United States cavalry. Saw him next after this at Belmont, Mass., in 1869, when he told about deserting, going into Dakota and seeing father. The record or family tree referred to by this witness shows the sons of Samuel McClelland and Catherine Hopkins were William (died in infancy), Charles (first son), and John (second son, married to Hannah Cruikshank, February 26, 1846); daughters, Elizabeth, Ruth, Catherine, and Ann; and that the children of John McClellan and Hannah Cruikshank were John C., born December 16, 1846, William S., born June 8, 1849, and James S., born August 28, 1851. Exhibit 50 discloses that John McClellan, of full age, wood-ranger, residence Lismullen, was married to Hannah Cruikshank, of full age, dressmaker, residence Kilcarty, in the parish church of Skryne, county Meath, by Richard Radcliff, according to the rites and ceremonies of the United Church of England and Ireland, February 26, 1846, and is certified to as a true copy of the marriage registry of

the parties under date of October 24, 1872, by Oliver Brighton, M. A. Clk. I of Skryne. Exhibit 53, the Wilber letter, is dated Chicago, Ill., November 10, 1869, and reads as follows: "Dear Mother: I got to this place some four weeks ago and am working at my trade, any kind of a carver can get work here now, and they pay good wages. I want to come back east again and will start as soon as I get a little ahead. I have had enough of the west and have lots to tell you. I left Leavenworth two days after I wrote you; got a chance to go north up the river with an outfit that was going to Dakota. I thought I would go along. I had a rough time of it and got all of that country I want. I found father, he would hardly believe me at first. When I told him about Uncle John he said the Cruikshanks were all fools anyway. He explained a lot of things I did not understand before, and I decided to give up the notion of going to California and will come back east again and tell you all about it. What are the boys doing, is John still at Watertown? Where is Jim? Where is Uncle Joseph, is he still at Portland, Me.? I am still going by the name of Wilber. Your affectionate son, William S. McClellan. Address, Henry Wilber, Chicago, Ill." The testimony of an alleged grandson of decedent was substantially as follows: Name William McClellan; residence Little Rock, Ark., age 30; father's name William S. McClellan. Mother died when witness was about a year old. Afterwards lived with grandmother Hannah McClellan, at Boston. About 1880, when about 9 years old, went to Arkansas and lived with Uncle James S. McClellan, preceding witness. Afterwards was at Pittsburg, Pa., with mother of witness' stepmother. Was with father's theatrical company. Knew that father wrote to grandfather, John McClellan, at Sioux Falls. Saw him write and mail some letters; could not say how many. He wrote a good many. Wrote frequently during a period of four years. Never saw any letter received from grandfather. Father died in 1888, when witness was about 16. After his death was engaged in various occupations. Was a sailor. Crossed ocean 15 times. Left sea in 1894. Went to Chicago, then to Omaha, and started for North Dakota. Traveled on the freight trains without paying fare. Reached Sioux Falls in fall of 1894, early in the morning. Mailed postal card addressed to John Mc-

Clellan, asking him to meet witness at post office between 6 and 7 in the evening; signed same: "William Standish." Waited around until evening. Saw man near post office, asked if his name was John McClellan, who answered "Yes." Witness said: "I wrote you a postal card this morning." He said: "You are not my son William Standish." Witness said: "No, I am his son, and your grandson." Walked up street. He asked questions about family. Said he knew grandmother was dead, but did not know witness' father was dead. He gave a lot of advice, said witness should go to his Uncle Jim in Arkansas, settle down, and learn a trade. The conversation was all on the street. He gave witness $15. Without speaking to any one about his grandfather witness left Sioux Falls, started for Arkansas, stopped at Creston, Iowa, and worked for R. H. Hanna, after which he went to Little Rock, where he has since resided. Witness works in planing mill, is married, and has one child. James S. McClellan, being recalled, testified that Exhibit 57 was in the handwriting of his nephew, William McClellan; that he received it through the mail at Little Rock in 1895, since when it had been in his possession until these proceedings were commenced. William McClellan, being recalled, testified that this exhibit was written by him in 1895, addressed to James S. McClellan, Little Rock, Ark., and mailed at Creston, Iowa. This letter which contains allusions to the writer's past life and his alleged visit to Sioux Falls corresponding with his testimony, was received in evidence over the objection that it was a self-serving declaration offered in absence of any effort to impeach the witness. R. H. Hanna, age 60, residence Creston, Iowa, testified that he first saw William McClellan, then present in court, at Creston in 1894; that he was in witness' employ until August, 1895; that he heard him say he was in Sioux Falls in summer of 1894; and that he said he had a rich relative living in Sioux Falls. The deposition of Emanuel Boone, Sr., was to this effect: Age 73, residence Hill township, Pulaski county, Ark. Have known John C. McClellan of Texas and James S. McClellan of Arkansas since 1880. Became acquainted with their mother Hannah McClellan in 1880. She died in 1880 or 1881. Shortly before her death she told the witness she was married in Ireland, to John McClellan; that they had but three children,

named John C., James S., and William S.; that she and her husband had separated. Witness knew William S. McClellan during a period of about four months, when he lived near the witness in Hill township. Heard William say his father's name was John McClellan, and that he lived in Dakota. Ralph Parliman, who had known decedent from June, 1878, to day of his death, testified that, on a hunting trip in 1894, in a farmer's house, he and the farmer having been talking about their wives and children, he said to decedent: "Now, tell us about your wife." To which decedent replied: "There is some things in a man's life he don't like to tell of." And that on the following morning decedent told the witness, in substance, that he was the father of three children.

Nearly all of the testimony introduced in support of the Arkansas claimants' petition was received over properly stated objections. Here again the presumption must prevail that all incompetent evidence was disregarded by the trial court in making its findings of fact, and, of course, such evidence should not now be considered for the purpose of setting aside the findings. Under well recognized rules relating to the proof of pedigree, there manifestly was sufficient uncontradicted competent evidence that Hannah Cruikshank married John McClellan in Ireland;. that he and she removed to Scugog Island and then to St. John; that they had three sons, two of whom were witnesses; that they separated at St. John on account of a quarrel between McClellan and his brothers-in-law. So the vital question is whether Hannah Cruikshank's husband was the decedent. It is, therefore, the evidence relating to this alleged identity which demands special attention. Were the declarations of Joseph Cruikshank, deceased, relative to what was revealed by the War Department records, admissible? Such declarations simply conveyed information of the fact that a man was, or had been, enrolled in a company or regiment serving in Dakota, under the name of John McClelland. Had Cruikshank been living and called as a witness, he could not have testified to the contents of the records. Nevertheless, the testimony under discussion was admissible for the purpose of showing that information had reached the family that the missing father might be in Dakota, not that he in fact was there, and that is all it tended to.

establish, a circumstance of extremely slight consequence. Next was the testimony relating to the statements and letter signed "Henry Wilber" of William S. McClellan, deceased, to the effect that he saw and conversed with his father in Dakota. This testimony, if competent, tended, in some degree, to establish the fact that Hannah's husband was in Dakota in 1869. Was it admissible? Among the recognized exceptions to the general rule, or principle, excluding hearsay evidence, are declarations relating to pedigree and family history. "The true grounds for the admission of this class of evidence are the necessity of the case and the improbability of such statements being false." 1 Elliott on Ev. § 362. The declarant must be dead, he must be a legal relative, there must be no desire actuating him to make a false statement, the declaration must be relative to a matter of pedigree, and the declaration must be ante litem motam. Id., §§ 364, 369. All these conditions existed. We think the testimony was admissible. Next comes the testimony of the grandson and his letter to his uncle. The letter was not admissible. The writer was living and called as a witness. Such self-serving declarations are excluded because open to the objections against hearsay evidence in general, and because their admission would open the door to fraud and to the fabrication of testimony. 1 Jones, Ev. § 236. With no means of knowing what the appearance of this letter was when introduced, its contents certainly leaves room for doubt as to whether it would not weaken rather than strengthen the cause for which it was produced. Then the identity of the decedent as a member of the Arkansas family rests almost wholly on the declarations of William S. McClellan, deceased, regarding having seen his father in Dakota in 1869; the testimony of the younger William regarding having seen his grandfather at Sioux Falls in 1894; the inference that decedent was the person they saw; and the testimony of Ralph Parliman regarding decedent's declaration when asked to tell about his wife, and his declaration that he was the father of three children. But this testimony was to be taken in connection with and considered by the trial judge in the light of all the competent evidence received in support of and opposition to all the petitions. It was for him to decide upon the credibility of each witness. It was for him to determine whether de-

cedent's true name was John McClellan; what, if any, truthful statements the decedent had made regarding his age, father's name, birth place, names of relatives, and as to whether or not he was ever married; what cause, if any, impelled the decedent to conceal his personal history; and why none of the letters alleged to have been written him by the Arkansas family, or nothing throwing light on his early life, was found among his private effects. Was decedent born in September, 1831, as shown by the lodge records and numerous other declarations? If so, he was only 10, when Robert Wilson left Ireland, and only 14, in February, 1846, when Hannah Cruikshank was married. Was it reasonable that the alleged son would refrain from writing his mother after seeing his father in Dakota, until he reached Chicago? Was his such a letter as would probably be written under the circumstances? Was it reasonable that he would write to his father frequently during a period of four years without receiving a reply? Was it reasonable that the alleged grandson would spend the day in Sioux Falls without making any inquiry concerning his grandfather? Would he probably have no curiosity or desire for information regarding his life, occupation, or possessions? No such information appears to have been imparted by the grandfather. What was the appearance and demeanor of this young man upon whose unusual story so much depended? This court has no means of knowing. The decision of the trial court should stand, in the absence of cogent reasons compelling a different conclusion. A careful consideration of the entire record will, we believe, leave an impartial mind totally unable to conclude whether or not these Arkansas claimants are sons and grandsons of the decedent, and, such being the case, it certainly cannot be said that there was a clear preponderance against the finding of the learned circuit court.

Another ground assigned by the Arkansas claimants in their motion for a new trial was "newly discovered evidence, material to the party making the application, which he could not, with reasonable diligence, have discovered and produced at the trial." Rev. Code Civ. Proc. 1903, § 301, subd. 4. This was supported by an affidavit of one of their attorneys; the certified copy of a marriage registry corresponding with the one introduced in evidence on the

trial; photographic reproductions of portions of the original marriage registry containing the signatures of the contracting parties; and several affidavits of persons who were familiar with decedent's handwriting, and who swore that they had examined the photographic signatures, and were of the opinion that one of them was the signature of the decedent. This was opposed by affidavits of other persons familiar with decedent's signature, who had examined the photographs and were of the opinion that they were not reproductions of decedent's signature. Two of the persons who made affidavits in opposition to the motion for a new trial subsequently filed affidavits to the effect that, upon further examination of the photographs, they desired to have their former affidavits withdrawn. The showing did not justify the granting of a new trial. The Arkansas claimants' petition was filed February 24, 1900. They then had in their possession what purported to be a certified copy of their father's and mother's registry. The last trial in the circuit court did not take place until June 11, 1901. If they desired another certified copy or photographs of the original and could not procure them, they should have applied for a continuance. Moreover, there was no dispute regarding the time and place of their ancestor's marriage. The second certified copy was merely cumulative and wholly unnecessary. The certified copy which was in their possession before their petition was filed disclosed that the original bore the signatures of the parties to the marriage. If they desired photographs of such signatures they should have procured them before the last trial, or have asked for a continuance. And the conflicting opinions regarding the signatures shown by the photographs justify the conclusion that they would have no effect upon the result, were a new trial granted. The policy of the law is to require a party to be diligent in securing and presenting his evidence when the cause is tried, and, when the proposed evidence is merely cumulative in its character, and unlikely to change the result in case a new trial should be granted, the motion for a new trial is properly denied. Demmon v. Mullen, 6 S. D. 554, 62 N. W. 380. It is proper to observe, in this connection, that the opinion evidence regarding handwriting introduced upon the trial, and used on the motion for a new trial, was of such a character and so conflicting as to be of no value whatever.

In view of the peculiar circumstances surrounding the estate involved in this proceeding, it will become the duty of the court having it in charge to insist upon the most efficient and honest administration until the property belonging to it shall have been lawfully distributed, and the state's attorney of Minnehaha county should have notice of all further proceedings in relation thereto, Rev. Civ. Code 1903, § 1111.

The estate should recover disbursements in this court and costs, except "for argument" to be taxed against the appellants. The orders appealed from are affirmed.